**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE 11 WITH BLACK BACK WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (445) 285-8643 IN THE CUSTODY OF THE PHILADELPHIA POLICE DEPARTMENT | **Case No. 26-MJ-1590** |

**AFFIDAVIT OF PROBABLE CAUSE IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS TO SEARCH AND SEIZE**

I, Patrick Lutz, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, hereby depose and state as follows:

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an Apple iPhone 11 with a black back, assigned call number (445) 285-8643 ("**TARGET TELEPHONE 1**"). **TARGET TELEPHONE 1** is currently in the custody of the Philadelphia Police Department.

2. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives and have been so since March 2023. I am currently assigned to the ATF Philadelphia Violent Crimes Task Force, the primary mission of which is to investigate those individuals and groups that are engaged in the commission of violent state and federal violations. I am a graduate of the Criminal Investigator Training Program and the Special Agent Basic Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to my employment with ATF, I graduated from Temple University with a degree in Criminal Justice. I was employed by the Philadelphia Police Department for approximately seven years. During that time, I worked as a Police Officer in the 35th District,

which covers part of Northwest Philadelphia, and I was assigned to a Tactical Enforcement Group. My law enforcement experience has included numerous investigations of violent crime, including firearm and drug-related offenses resulting in the seizure of various controlled substances and firearms. These investigations have resulted in the arrest and successful prosecution of individuals who have committed violations of federal and state law, including but not limited to firearms offenses and narcotics trafficking. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by violent criminal offenders.

3. I am currently assigned to the ATF Violent Crime Task Force. As a Special Agent for the ATF, I have investigated violations of federal law being committed by violent offenders and criminal organizations, including robberies, drug offenses, kidnapping, and firearms offenses. I have successfully completed the Criminal Investigator Training program as well as the ATF Special Agent Basic Training program. As a result of my training and experience, I am familiar with investigations involving violations of Federal firearms and narcotics laws, and I am familiar with Federal search warrants and seizing evidence in accordance with the probable cause set forth in the affidavits. I have attended training encompassing the use of electronic devices as a means of communication and am familiar with the use of cellular phones and electronic communication to facilitate criminal activities.

4. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is a "district court of the United States (including a magistrate judge of such court) . . . that has jurisdiction over the offense being investigated[.]' 18 U.S.C. § 2711(3)(A)(i).

5. As an ATF Special Agent, I am a "law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. During my law enforcement career, I have investigated an array of complex federal and state crimes. I have training and experience in the use of cellular telephones and social media during and in the furtherance of criminal activity. I also have training and experience in searching cellular telephones and social media to gather evidence of criminal conduct that may be present on such devices and accounts. In these investigations, I have been involved in the application for and execution of numerous arrest and search warrants related to the aforementioned criminal offenses. I have received specialized training from ATF relating to the use of firearms in violent crime and ballistic technology used to identify, match, and link crime guns to incidents. My law enforcement experience has included numerous investigations of violent crime, firearm-, and drug-related offenses resulting in the seizure of various controlled substances and firearms. These investigations have resulted in the arrest and successful prosecution of individuals who have committed violations of federal and state law, including but not limited to firearms offenses and narcotics trafficking. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by violent criminal offenders. As a result of my training and experience, I am familiar with investigations involving violations of federal firearms and narcotics laws, and I am familiar with federal search warrants and lawfully seizing evidence. I have attended training encompassing the use of electronic devices as a means of communication and am familiar with the use of cellular phones and electronic communication to facilitate criminal activities.

6. While participating in these and other criminal investigations, I have prepared affidavits and executed search warrants and arrest warrants.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery) and 18 U.S.C. § 924(c)(1) (Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence) have been committed by Timothy HOWARD. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

9. I previously submitted an identical Affidavit in support of an application for a search warrant for **TARGET TELEPHONE 1** on June 17, 2026, however though I correctly identified the phone number in the body of the affidavit, I incorrectly identified the phone number in the captions of the affidavit, warrant, and application. The Honorable Scott W. Reid, United States Magistrate Judge, approved the affidavit, warrant, and application under Magistrate Number 26-MJ-1207. This Affidavit is substantively identical to the Affidavit in Magistrate Number 26-MJ-1207, except that the phone number is now corrected, I have added footnote 2, I am not requesting to seal, and I updated the time frame in Attachment B.

## PROBABLE CAUSE

### Summary of Probable Cause

10. Evidence gathered in this investigation shows that Timothy HOWARD used **TARGET TELEPHONE 1** when he committed a gunpoint robbery at McDonald's on 2109

North Broad Street on January 7, 2026. Law enforcement recovered surveillance footage from multiple sources that captured HOWARD before, during, and after the robbery. **TARGET TELEPEHONE 1** was recovered from HOWARD's person at the time of his arrest shortly after the robbery. As discussed in detail below, HOWARD carried and used **TARGET TELEPHONE 1** on his way to the robbery when he rode the subway, when he was inside the McDonald's during the robbery, and after the robbery when he returned to the subway. Thus, there is probable cause to believe that the information contained in Attachment B is likely to contain evidence of 18 U.S.C. § 1951(a) (Hobbs Act Robbery) and 18 U.S.C. § 924(c)(1) (Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence) committed by HOWARD.

**Gunpoint Robbery of McDonald's on January 7, 2026**

11. On January 7, 2026, a commercial gunpoint robbery occurred at McDonald's on 2109 North Broad Street. The Philadelphia Police Department (PPD) received a radio call for a robbery in progress stating that a male (later identified as Timothy HOWARD) wearing a black mask and jacket robbed the store, and was last seen headed into the subway at the Broad and Susquehanna SEPTA station.

12. Law enforcement responded to the McDonald's location at 2109 North Broad Street. Law enforcement recovered surveillance video from multiple locations, including from the McDonald's and surrounding SEPTA stations. The video recovered from McDonald's and the surrounding area tracked HOWARD minutes before the robbery as he arrived to the area via the subway. It tracked him entering the McDonald's and it captured HOWARD committing the robbery. The video also tracked him leaving the McDonald's and returning to the subway.

13. SEPTA surveillance video from June 7, 2026 at approximately 10:28 a.m. shows a black male enter the northbound Broad Street Line at City Hall Station, later identified as defendant HOWARD. HOWARD was wearing black pants with white rectangular patches, green shoes, and a black, front zip hoodie with a pattern that resembles bones on the front and a shark mouth on the hood, riding the Broad Street Line to the Broad and Allegheny stop. During this time HOWARD held a black cell phone (**TARGET TELEPHONE 1**) in his left hand and up to his ear. HOWARD utilized the cell phone while on the subway, appearing to exchange phone numbers or information with another passenger. At approximately 10:38 a.m. SEPTA video surveillance also showed HOWARD hold the phone in front of his face while he exited the subway at the Susquehanna/Dauphin Train Station, which was twelve minutes prior to the robbery.

14. The surveillance video recovered by law enforcement shows that at approximately 10:50 a.m. a black male, later identified as defendant HOWARD, entered the McDonald's location at 2109 North Broad Street and began using a kiosk in the lobby. As he walked into the McDonald's, he held a black cell phone (**TARGET TELEPHONE 1**) in his left hand. When he entered, McDonald's employee L.J. [1] , directed HOWARD to the kiosk to order and asked him if he needed help. After HOWARD was done using the kiosk, he walked to the cash registers to pay in cash. HOWARD handed L.J. five one-dollar bills, which prompted the cash register to be

[1] L.J.'s identity is known to investigators and has been interviewed by law enforcement in connection with this investigation. L.J. is providing information as a victim/witness to a crime and not in anticipation of receiving financial compensation or prosecutorial or judicial consideration in connection with any criminal matter. L.J.'s name is being withheld to protect L.J.'s privacy and safety. L.J. is believed to be truthful and credible as investigators have corroborated information provided by L.J. L.J. was adjudicated delinquent as a juvenile for a felony burglary offense.

opened. As the cash register drawer opened, HOWARD held **TARGET TELEPHONE 1** in his hand.

15. When the register drawer opened, HOWARD pulled out a black firearm from a black bag he carried and pointed it at L.J. L.J. reported to law enforcement that HOWARD said, "You know what, I'm gonna need all that;" and "Hurry up". L.J. took approximately $200 from the cash register door and gave it to HOWARD. HOWARD put the money into the same black backpack from which the firearm was pulled. HOWARD immediately left the store. Video surveillance shows that he fled out of the door onto Broad Street and fled northbound. L.J. notified her coworkers of the robbery and an employee called 911 to report the robbery.

16. At approximately 10:53 a.m., PPD Officers received the robbery in progress radio call that had been dispatched over police radio. Moments later, HOWARD, who matched this verified descriptive information (also known as "flash information"), was observed by PPD personnel underground in the area of the subway platform at the Broad and Susquehanna station. Upon HOWARD observing PPD, he fled in the opposite direction. SEPTA video surveillance showed HOWARD holding **TARGET TELEPHONE 1** in his hand as he entered the subway station, minutes after the robbery, and while he was underground on the subway station platform.

17. During a brief foot pursuit, a PPD sergeant observed the suspect exit the subway. PPD officers observed the suspect for several blocks and briefly lost sight of him in the area of 1300 W. Susquehanna Avenue in Philadelphia, approximately two blocks from the McDonald's in question.

18. As a result of the robbery in progress radio call, a police presence mounted in the area of 1300 W. Susquehanna Avenue and surrounding blocks. While surveying the area, PPD

officers were directed to landscaping bushes on the edge of a parking lot in that area. PPD officers surveyed the area and observed HOWARD coming from the bushes into the parking lot. TARGET TELEPHONE 1 recovered from HOWARD

19. The PPD Sergeant who originally pursued HOWARD near the subway confirmed that HOWARD was consistent with the suspect he pursued. PPD officers placed HOWARD into custody. From underneath a car near the bushes discussed above, PPD recovered evidence consistent with items used or worn by the suspect as seen on surveillance video. PPD recovered a black zip-up jacket with a bone design and shark head design, and a black backpack. The black backpack contained a black Hi-Point .45 caliber semi-automatic handgun, model JHP, with no serial number loaded with nine live rounds of ammunition, a black mask, and approximately $125 of cash.[2] PPD recovered **TARGET TELEPHONE 1** from HOWARD's person.

[2] Philadelphia police executed a search warrant for a buccal swab of Howard to compare Howard's DNA to swabs that were taken from the firearm, mask, and jacket for purposes of a DNA comparison. On August 6, 2026, a comparison of the firearm swabs and Howard's DNA was completed by Philadelphia Criminalistics Unit. This Criminalistics Unit Report was not available when I submitted the application in connection with Magistrate Number 26-MJ-1144. The Criminalistics Report states, in summary: (1) the DNA detected in a sample from neckline and cuffs of the jacket shows that the "major component of the DNA mixture detected in this sample is consistent with the DNA profile obtained from Timothy Howard. Excluding an identical twin, Timothy Howard is the source of the major component of the DNA mixture detected in this sample." (2) the DNA detected from the mask is consistent with a "mixture of partial DNA profiles originating from at least two individuals, at least one of whom is male. Due to insufficient data, the origin of the DNA detected in this sample relative to Timothy Howard is inconclusive." (3) the DNA detected in a sample from the inner lining of the jacket shows that the "major component of the DNA mixture detected in this sample is consistent with the DNA profile obtained from Timothy Howard. Excluding an identical twin, Timothy Howard is the source of the major component of the DNA mixture detected in this sample." (4) the DNA detected in a sample from one touch swab of the firearm is consistent with a "mixture of partial DNA profiles originating from at least two individuals, at least one of whom is male. Due to insufficient data, the origin of the DNA detected in this sample relative to Timothy Howard is inconclusive." And (5) the DNA detected in a sample from one touch swab of the firearm is consistent with a "mixture of partial DNA profiles originating from at least two individuals, at

HOWARD was wearing black pants with white rectangular patches, green shoes, and a t-shirt. The shoes and pants are consistent with the clothing that HOWARD was observed on video wearing in SEPTA stations and in the McDonald's. Also, as discussed above, a jacket consistent with the one he was observed wearing was recovered in the area.

20. Thus, considering the totality of the circumstances, in particular video surveillance, the evidence indicates that HOWARD's cellular device was used during the commission of, before, and after this commercial robbery. Because HOWARD was observed holding **TARGET TELEPHONE 1** before, during, and after the robbery, and it was located with HOWARD during his arrest I believe that a search of records and information associated with **TARGET TELEPHONE 1** will establish HOWARDS' whereabouts throughout this commercial robbery, and therefore provide evidence that HOWARD was present at 2109 North Broad Street (McDonald's) on the day and time of the robbery.

21. Based on my training and experience and the training and experience of those with whom I have consulted, I know that a person who is involved in criminal activity, including commercial robberies, often uses electronic devices, and thereby use their respective data-storage or cloud storage accounts, including but not limited to wireless telephones such as **TARGET TELEPHONE 1**, to aid in their criminal activities. I also know, based on my training and experience, suspects frequently communicate with each other prior to, during and/or after the

---

least one of whom is male. Timothy Howard is excluded as a contributor to the DNA mixture detected in this sample."

In my training and experience and from conversations with forensic analysts who analyze DNA comparisons, I know that firearms can be difficult surfaces to obtain DNA profiles from for purposes of DNA comparisons and I know that where an individual is excluded as a contributor of DNA to a particular surface does not conclusively or necessarily mean that an individual did not hold or possess an object.

commission of a crime, and frequently utilize cellular phones during the commission of a crime. Further, those involved in criminal activities such as commercial robberies often utilize electronic communications to discuss the details of the illegal activity. Additionally, individuals engaged in such offenses often utilize GPS and map applications during and after the commission of such offenses. For these reasons, and others, individuals often bring their cellular devices during and after the commission of such offenses. I also know that individuals who participate in robberies often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their robbery activities.

22. I know that those involved in robberies communicate with associates or co-conspirators using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those individuals who participate in robberies communicate with associates or co-conspirators using cellular telephones to send e-mails and text messages and communicate via social media networking sites as outlined extensively above. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

23. Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts. I am aware that individuals who participate in robberies frequently list associates or co-conspirators in

directories, often by nickname or to avoid detection by others. Such directories as the ones likely contained in the subject cellular telephones, are one of the few ways to verify the numbers (i.e., telephones, pagers, etc.) being used by specific robbery co-conspirators.

24. In addition, I know that those involved with individuals who participate in robberies often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones. This evidence would show associations between any accomplices, i.e., photographs of accomplices and/or individuals common to coconspirators, and/or would show any planning of the robbery. I am also aware that individuals who participate in robberies often take photographs or make videos of firearms with their cellular telephones and tablets. Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to any associates, and/or to upload to social media.

25. Moreover, even when a criminal event is committed by one person, without the apparent assistance of others, a cellular device often reveals evidence relating to the criminal's identity. For instance, an analysis of phone call logs, text message history, photographs and social medial applications will often reveal evidence of user attribution of the device which in turn reveals the identity of the suspect in the crime. Here, for instance HOWARD's cellular phone records, particularly those surrounding the time period of the crime will assist in establishing his identity as being the robber.

26. Furthermore, based on my training and experience and the training and experience of other Agents and Task Force Officers, I know that individuals who participate in robberies often use a cellular phone's Internet browser for web browsing activity related to their activities. I know that individuals who participate in robberies also use their cellular telephone's Internet

browser to update their social networking sites in order to communicate with co-conspirators, and to display firearms and/or proceeds from their robberies, or to post photographs of locations where they have traveled in furtherance of their robbery activities. I am also aware that robbers will at times use the internet functions of cellar telephones to identify locations, or targets, to rob.

27. In addition, individuals who participate in robberies sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their robbery activities. These electronic devices may also contain GPS navigation capabilities and related stored information that could identify where these devices were located. Here, for instance, HOWARD's use of the phone before and after the robbery indicates to me that it may have been used in this manner in planning routes to and from the crime.

28. Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used. In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN). The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used. In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

29. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, Agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be co-mingled with criminal evidence. In other

cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require Agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the ATF intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

30. Your Affiant therefore believes and asserts that a search of the electronic files and memory of **TARGET TELEPHONE 1**, will yield evidence of violations of federal laws, including, but not limited to, disclosing the identities of persons involved in the commission of these offenses. Evidence of calls and text messages made in the course of the events related in this affidavit are also expected to be disclosed by the requested search.

31. Therefore, based on the information, facts and circumstances stated above, your Affiant believes that **TARGET TELEPHONE 1** will provide investigators with additional information related to the ongoing investigation of the robbery committed by HOWARD. Accordingly, I respectfully request that the Court issue a warrant that includes permission to search **TARGET TELEPHONE 1.**

## CONCLUSION

32. I submit that this affidavit supports probable cause for a warrant to search the cellular phone described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

*/s/ Patrick Lutz*
Patrick Lutz
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn to telephonically before me on August 14, 2026.

*s/Katayoun M. Copeland*
UNITED STATES MAGISTRATE JUDGE
KATAYOUN M. COPELAND

## ATTACHMENT A

### Property to Be Searched

An Apple iPhone 11 with a black back, assigned call number (445) 285-8643 ("**TARGET TELEPHONE 1**") that was recovered from Timothy HOWARD and currently in the custody of the Philadelphia Police Department.

# ATTACHMENT B

## Property to be Seized

From **TARGET TELEPHONE 1,** all records relating to violations of 18 U.S.C. § 1951(a) and 18 U.S.C. § 924(c)(1), and involve HOWARD from January 6, 2026 to January 7, 2026, including:

a. Electronic communications relating to the criminal activity;

b. Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed, telephone numbers of incoming, outgoing or missed calls, text/picture messages, schedule entries, stored memoranda, videos, social networking sites and digital photographs;

c. Any information related to sources of firearms, including names, addresses phone numbers, and any other identifying information;

d. Any information relating to firearms parts and accessories;

e. Any information related to the methods of committing and planning the robbery described in the Affidavit;

f. All bank records, checks, credit cards, credit card bills, account information, and other financial records;

g. All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system;

h. Stored memoranda; stored text messages; stored electronic mail; stored photographs; stored audio; and stored video;

i. Evidence of the presence or absence of software that would allow others to

control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

j. Evidence of the attachment of other devices;

k. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

l. Evidence of the times the device was used,

m. Passwords, encryption keys, and other access devices that may be necessary to access the device;

n. Records of or information about Internet Protocol addresses used by the device;

o. Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, as well as evidence of the posting of videos, photos, or any material relevant to these crimes to any social networking site;

Evidence of user attribution showing who used or owned the electronic device at the time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history.

All of which constitute evidence and/or instrumentalities of violations of 18 U.S.C. § 1951 and 18 U.S.C. § 924(c).